C. S. YUEN v. GEORGE K. FRENCH AND S. C. HUBER.

No. 1704.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT. HON. F. ANDRADE, JUDGE.

ARGUED FEBRUARY 1, 1927.          DECIDED FEBRUARY 11, 1927.

PERRY, C. J., BANKS AND PARSONS, JJ.

FRAUDULENT CONVEYANCES—mortgage—fictitious consideration—secret reservation.

A mortgage given by a creditor in failing circumstances to secure a debt in large part fictitious and with a secret reservation of a beneficial interest in favor of the mortgagor is a fraud on creditors, whether so intended or not, and should be set aside in toto by a court of equity upon the petition of a creditor, whether existing or subsequent.

EVIDENCE—presumptions—probable consequences.

Every person is presumed to intend the natural and plainly probable consequences of his acts.

OPINION OF THE COURT BY PERRY, C. J.

This is a suit in equity for the cancellation of a mortgage on the ground that it was given with the purpose of defrauding creditors. The allegations of the bill are in brief as follows: that on May 15, 1924, the respondent French was indebted to one Katherine Ryan in the sum of $150 for services rendered as stenographer

and that thereafter the complainant became the owner of her claim by assignment; that on December 4, 1924, respondent French was indebted to Emmeluth & Co. in the sum of $78.65 for labor performed and that thereafter the complainant became the owner of the claim by assignment; that the total balance due upon these two claims is $182.30; that on April 17, 1925, the complainant recovered and still holds a judgment against the respondent French for the said sum of $182.30 upon the two claims referred to; that on February 1, 1924, respondent French, being at that time the owner of certain real estate in Honolulu, executed and delivered to the respondent Huber a mortgage upon said property, which was recorded; that the intent of the parties to the mortgage was to thereby defraud the creditors of the respondent French, including the complainant; that at the time of the giving of the mortgage the amount owed by respondent French to respondent Huber was $1500, that upon the face of the mortgage the amount of the debt thereby secured was $5500 and that the balance of $4000 was in reality in excess of the true debt; that at the time of the execution of the mortgage claims aggregating over $4000 were held against the respondent French by creditors other than the complainant and that these claims still remain due and unpaid; that attachments have been issued by the circuit court of the first circuit against the mortgaged property in the aggregate of over $4000 and remain in full force; that at the time of the execution of the mortgage the mortgaged property was of the value of $12,500, that this fact was known to the two respondents and that there were outstanding against the property two earlier mortgages, one in the sum of $5000 and one in the sum of $2500 and that these two earlier mortgages are still in force and effect; that with full knowledge of the

facts the respondents conspired with each other for the purpose of defeating the just claims of the complainant and to that end executed the third mortgage just referred to; that the third mortgage was executed with the intent to hinder, delay and defraud creditors; and that at the time of the execution of the mortgage the respondent Huber intended and still intends to return to respondent French or to hold subject to his order the amount thereby secured in excess of the true debt. The prayer is that the mortgage be set aside.

The mortgage in question is in ordinary form, naming the respondent French as mortgagor and the respondent Huber as mortgagee and reciting that it is executed in consideration of the sum of $5500 "to him" (French) "in hand paid by the said mortgagee, the receipt whereof is hereby acknowledged." It contains the proviso that if the mortgagor shall pay the sum of $5500 with interest at eight per cent per annum within one year from its date and all of the costs of release then the mortgage shall be void; that if there shall be any default in the payment of the sum of $5500 or interest at the time named or in the observance or performance of any of the other terms of the instrument the mortgagee may deem the entire amount secured to become at once due and payable and may foreclose; and that from the proceeds of the foreclosure sale the mortgagee shall deduct all expenses of foreclosure "and the amount due herein" and shall render "the surplus, if any, to the mortgagor, his heirs and assigns."

Separate answers were filed by the two respondents on May 16, 1925. In each, all of the fraud charged is denied and the execution of the mortgage in question and the existence of the two prior mortgages are admitted. In that of the respondent Huber it is alleged that at the time of the execution of the mort-

gage "it was expressly understood * * * that said mortgage was given as security for sundry debts owed by the respondent French as follows, to-wit: to Nunn, Bush & Weldon Shoe Company $372.36, together with interest on said sum at the rate of 8% per annum from the 23rd day of May, 1923, claim for which was then and ever since has been and now is held by Huber & Kemp as attorneys for said creditor; to George S. Curry, as attorney for clients, $251.45, together with interest thereon; to John Waterhouse * * * $2600.00, together with interest thereon; and to Robert H. Menaugh * * * $415.00, together with legal interest thereon"; that on November 26, 1924, after the delivery of the mortgage, respondent French advised respondent Huber that "among the debts secured by the mortgage was the sum of $250.00 owed by said French to Edna Hill" and "at a later time shortly thereafter * * * respondent French advised respondent Huber that included in the debts secured by said mortgage was another and further sum owing to John Waterhouse in the sum of $1400.00"; and that the claims of the shoe company and the other items of indebtedness mentioned are still wholly unpaid and are all *bona fide* debts of respondent French.

In the answer of respondent French it is alleged that the sum of $5500 named in the mortgage "is the true amount intended to be secured by said mortgage and is not in excess of the correct amount of the debt secured thereby;" that on February 1, 1924, respondent Huber "held a valid claim against respondent French in the sum of $372.36 in favor of a client" and that respondent Huber "suggested to respondent French that the matter should be put in some tangible form, to which respondent French assented;" that on February 1, 1924, "respondent French was also indebted to John Waterhouse in the sum of $2600.00, to George Curry, representing one

Frank Nichols, in the sum of $241.45, to Robert Menaugh in the sum of $250.00" and to several other persons named, in various amounts set forth; that "the various items of indebtedness herein enumerated amounted to the gross sum of $5,168.48 on said February 1, 1924," and respondent French "thereupon, in order to secure the above-mentioned indebtednesses, executed the said mortgage in the sum of $5500.00 * * * the difference between said gross amount of $5,168.48 and said sum of $5500.00 being equivalent approximately to interest on said various sums;" that respondent French "selected and named respondent Huber as mortgagee in the mortgage because of his reputation for probity and high standing in this community, for the purpose of making his creditors hereinbefore mentioned feel safe in their rights thereby secured and also because he knew that his own interests would be absolutely safeguarded;" that on May 14, 1924, respondent French became indebted to said John Waterhouse in the further sum of $1400, "on respondent's representation that there was equity remaining in his real property sufficient in conjunction with said mortgage made and executed to said Huber to protect him to such further extent;" that "it was his intention that said further sum of $1400 should be secured by said mortgage;" and that it was respondent's belief, at the time of filing the answer, that the mortgaged property was "worth fully $15,000."

The respondent French left the Territory prior to the trial in the court below, was not present or represented at the trial and did not offer any evidence by deposition or otherwise. The respondent Huber appeared and contested the petition. The circuit judge held the mortgage to be fraudulent and entered a decree setting it aside. From that decree the respondent Huber appeals.

The allegations concerning the complainant's standing

as a creditor of French were proven by undisputed evidence. French in his answer admitted that at the time of the execution of the mortgage he owed debts amounting to about $5500. The evidence showed that at the date of the mortgage the mortgaged property was of the market value of from $12,000 to $12,500, that the two earlier mortgages in favor of the Bank of Hawaii were foreclosed by sale on August 22, 1925, that the mortgaged property was sold at that auction for $12,875, and that the surplus remaining after satisfying the claims of the Bank of Hawaii was $3,178.26. From French's answer it appears that at the date of the mortgage he thought the property was "worth fully $15,000" and Huber testified that at that time he was under the impression that "the property would undoubtedly move within a short time" because Mr. Kearns told him that "we should not have any trouble in moving it a little under $17,000."

The firm of Huber & Kemp, of which Mr. Huber is a member, were attorneys for the Nunn, Bush & Weldon Shoe Company in an endeavor to collect from French a claim of about $1600 for moneys collected by French from one Wai Ah Nin. Upon presentation of the claim against French the latter answered that he had receipted, on behalf of the shoe company, for the payment of the claim, upon receiving a note of Wai Ah Nin by way of settlement, considering the note good, adding that he had made a remittance to the shoe company. (It appears from the evidence that French had collected the amount of the note from Ah Nin and had retained the money, instead of remitting it as claimed by him.) Huber & Kemp reported the alleged remittance to their clients and later heard from them again and in pursuance of this second letter called on French, who at that time exhibited to Mr. Huber his (French's) check book and

a letter-press copy of a letter showing that he had made a remittance the day before for the amount claimed. This again was reported to the clients who replied that the checks that French had remitted in payment had not been honored by the bank and instructed the attorneys to demand payment. This instruction was complied with. Mr. Huber "pressed Mr. French for payment at that time." Part payments were subsequently made by French, leaving a balance due of about $276.46. Mr. French offered to give a mortgage on his home for the amount due. Mr. Huber at first replied that his clients "back in Ohio" did not want a mortgage on property in Hawaii but wanted their money, but later acquiesced in the repeated suggestion that the mortgage be given. French then said: "I am going to execute that mortgage but have just borrowed $2600.00 from John Waterhouse and I want to include that and an item I owe Mr. Menaugh and some little things George Curry is pressing me on and I don't want to make a whole string of mortgages. I would like to cover it in one mortgage and run it to you." Huber acquiesced provided his clients' claim "should come first." French said that was agreeable to him and subsequently prepared the mortgage. By telephone he inquired of Huber whether he (French) should send the mortgage to him "first or send it over for record" and Huber said, "send it over for record." Later the mortgage was delivered to Huber. According to Huber's testimony, either at the time the mortgage was delivered or "between the time the mortgage was delivered and the time he" (French) "stated he would execute the mortgage and the time he notified me by phone that he had executed it" French gave Huber a memorandum showing that the amount due to Waterhouse was $2600, to Menaugh $415 and to Curry $241.53. Upon actually receiving the mortgage and seeing that

the consideration named was $5500 Huber inquired of French "about that consideration" and was told by French: "I owe some other little things that I want to take care of out of this sale and the mortgage was made in an amount to cover about what these items were" but "he didn't state to me at that time who any of the claimants were or what any of the claims were that he intended to include in such a list." It was not until October, 1924, several months after the execution and delivery of the mortgage, that French actually named to Huber another creditor whom he wished to have paid out of the proceeds of the same,—a Miss Edna Hill, whose claim amounted to $250.

Mr. John Waterhouse testified that on January 31, 1924, the day before the date of the execution of the mortgage to Huber, French came to him and asked for a loan of $2600, telling him that his Manoa property was up for sale with the Bishop Trust Company, that there was enough equity left to satisfy Waterhouse's claim and that the loan would be repaid out of the proceeds of the sale of that property. At that time French did not say anything to Waterhouse about mortgaging his property to secure the loan of $2600. On April 23, 1924, nearly three months after the execution of the mortgage, French borrowed an additional $1400 from Waterhouse. "Between those two dates" (i. e., between February 1 and April 23) "I don't know when, he told me he had been unable to sell the property; that he had made or was making a second mortgage to Mr. Huber and that I would be taken care of in that second mortgage. That was sometime after the date I made the loan. There was no such thing, to my recollection, of any second mortgage being made when he made the original borrow." (This is from Mr. Waterhouse's testimony.)

Shortly prior to the execution of the mortgage in question Mr. Huber knew that the firm of Thompson, Cathcart & Beebe represented creditors having claims against French and were pressing French for the payment of those claims and also knew of the experience he himself had had in endeavoring to collect from French on behalf of the shoe company. He knew of the two prior mortgages in favor of the Bank of Hawaii and of an existing attachment against French's property. He knew that French was having difficulty in meeting the claims against him, was in failing circumstances and was resorting to doubtful expedients in order to avoid or delay payment. Assuming that, as found by the trial judge, the appellant "did not intend to be a party to any scheme or conspiracy entered into with French for the purpose of hindering, delaying or defrauding French's creditors," the fact remains that, with knowledge that French was in failing circumstances financially, he accepted from French a mortgage which upon its face declared that French owed him $5500 and authorized foreclosure by him upon non-payment of that sum,—this at a time when in fact French was not at all indebted to Huber personally and when the only debt that he owed to Huber & Kemp, as attorneys for the shoe company, was $372.36 and when the total of all the four debts mentioned by French to Huber as intended to be secured by the mortgage was $3,628.81. Without referring in this connection to the four claims aggregating $3,628.81, there was nothing in the mortgage or in the circumstances and the law to require French to designate at a later date any other creditors as beneficiaries under the mortgage. The power which remained to him to designate one or more additional creditors to the exclusion of one or more other creditors from the benefits of the mortgage and the power likewise remaining to him not to designate any creditors

at all and to reserve the balance of about $1900 for his own use were the equivalent of a secret reservation of a beneficial interest in the property for himself and the mortgage with that secret reservation would necessarily operate as a method of unlawfully defeating, delaying or hindering his creditors, both present and subsequent. In the view most favorable to appellant, the amount of the debt stated in the mortgage was exaggerated and, in large part at least, fictitious. It is a well-known prin- ciple of law, recognized by our statutes (R. L. 1925, Sec. 3934), that "every one shall be presumed to intend the natural and plainly probable consequences of his acts." See *Butts* v. *Peacock,* 23 Wis. 359, 361. "A conveyance of real estate by a debtor to another, to be held wholly or in part in trust for him, is a fraud on creditors whether so intended or not, as it places beyond their reach a valuable right and gives to the debtor the beneficial en- joyment of what rightfully belongs to them.  *  *  * In such a case the conveyance is void as to existing and subsequent creditors. The fraud is a continuing one, and may actually operate as such as well in reference to debts contracted after as before the conveyance." *McKey* v. *Cochran,* 104 N. E. (Ill.) 693, 696. See, also, 14 Am. & Eng. Ency. L. 271; 272, n. The contesting respondent must be presumed to have intended the natural and plainly probable consequences of his acceptance of a mortgage reserving this secret interest to the mortgagor and necessarily operating to defraud his creditors. The mortgage, to the extent of the fictitious excess, was well calculated to deceive creditors, existing and future, as to the status of the debtor's property and to mislead them into a failure to press their claims until it became too late to find anything to levy on.

"The basis of commercial credit is the creditor's con- fidence in the debtor's ability to meet the obligation con-

tracted. Although this confidence may sometimes rest
upon the debtor's skill in business, his honesty and in-
dustry, it is upon his ownership of property and conse-
quent responsiveness to the coercive power of the law to
enforce satisfaction of the debt that reliance is most
generally placed. If, therefore, after contracting an obli-
gation, a debtor disposes of the property upon the faith
of the ownership of which credit has been extended, so
as to disappoint the just expectation of his creditor, he
commits a fraud which the law cannot tolerate." 14 Am.
& Eng. Ency. L. 221. In the very first decision reported
in the first volume of Hawaii Reports, in the case of
*Wood* v. *Stark,* presiding Judge Lee recognized and gave
forcible expression to these principles. In instructing
the jury that a lease made with intent to defeat certain
judgments was void, he said: "If we were allowed, when
we find that judgments are existing against us, or are
about to be recovered against us; if we were allowed,
I say, in such circumstances to transfer our property
into the hands of others, and thus defeat the just claims
of honest creditors, there would be no safety in the every
day transactions of life—no safety in that credit which
we are daily giving and lending to each other." The
statute of 13th Elizabeth, chapter 5 relating to convey-
ances made in fraud of creditors, was in affirmance of
the principles of the common law and is a part of the
common law of this Territory. This was so held in *Dee*
v. *Foster,* 21 Haw. 1, 3. In *Cockett* v. *Hubbard,* 1 Haw.
101, the court said: "Fraud is so offensive to every prin-
ciple of law, that where a conveyance is tainted with it,
the deed cannot be permitted to stand. Where a man
purchases property with a view of defeating the claims
of creditors, the sale is void; for the purpose is iniqui-
tous. The law will not allow one man to assist another
in cheating a third."

"If any part of the debt secured by the conveyance is not *bona fide,* or does not exist at the time of the conveyance, or the conveyance is made by the debtor for the purpose of hindering, delaying and defrauding his creditors in the enforcement of their claims, and the creditor thus preferred either knew of or participated in the purpose of the debtor when the transaction was consummated, it will be held to be fraudulent as to other creditors." *Bates County Bank* v. *Gailey,* 75 S. W. (Mo.) 646, 652. "The law will not permit a debtor, in failing circumstances, to sell his land, convey it by deed, without reservations, and yet secretly reserve to himself the right to possess and occupy it for a limited time, for his own benefit. * * * A trust, thus secretly created, whether so intended or not, is a fraud on creditors, because it places beyond their reach a valuable right—the right of possession—and gives to the debtor the beneficial enjoyment of what rightfully belongs to his creditors." *Lukins* v. *Aird,* 6 Wall. 78, 79 (18 L. Ed. 750). See, also, 14 Am. & Eng. Ency. L. 268; 27 C. J. 600; 12 R. C. L. 545, 546; *Wood* v. *Scott,* 55 Ia. 114, 116, 117; *Smith* v. *Conkwright,* 28 Minn. 23, 26; *Molaska* v. *Steele,* 36 Mo. App. 496, 503, 504; *Riley Co.* v. *Ryus,* 202 S. W. (Mo.) 582, 583; *Roberts* v. *Barnes,* 30 S. W. (Mo.) 113, 116; *Ellis* v. *Musselman,* 61 Neb. 262, 263; *Hafner* v. *Irwin,* 23 N. C. 385, 391; Jones, Chattel Mortgages, Sec. 339.

While the authorities are not uniform as to whether when a mortgage is given to secure a valid debt but at the same time is so given as to operate, as to a part of the consideration named, to defraud creditors, it should be held good as to part and void as to part, the weight of authority and the weight of reason are in favor of the view that in such a case the mortgage must be declared void as a whole,—on the theory that to hold otherwise would be to encourage fraud. Intending per-

petrators of a fraud would have nothing to lose if their nefarious scheme failed and might gain something if it succeeded. "If a bill of sale, mortgage, * * * be executed, * * * for the amount of several debts, one of which is tainted with fraud, or if fictitious debts be included in the amount, or real ones be exaggerated, the whole instrument * * * or transaction is void." 14 Am. & Eng. Ency. L. 269. To the same effect is 27 C. J. 545. "The contention that the conveyance to Mrs. Short may be sustained to the extent of the adequate and honest part of the consideration is fully answered by the authorities which hold that, where the deed is fraudulent against creditors, it is wholly void, and cannot stand to any extent as security or indemnity. * * * A different rule would put a premium upon fraud. Almost invariably, some honest consideration is made the agency for floating a scheme of fraud against creditors, and, if that may always be saved, nothing is lost by the effort, and the temptation to venture it is increased." *Baldwin* v. *Short,* 26 N. E. (N. Y.) 928, 929. To the same effect are *Adams* v. *Pease,* 113 Ill. App. 356, 360; *Thornton* v. *Hendrickson,* 213 Ill. App. 121, 128; *Wallach* v. *Wylie,* 28 Kans. 97, 107; *Boland* v. *Ross,* 25 S. W. (Mo.) 524, 526; *Cole* v. *Yancey,* 62 Mo. App. 234, 239; *Elliott* v. *Johnson,* 102 S. E. (W. Va.) 681, 683; *Imhoff* v. *McArthur,* 48 S. W. (Mo.) 456, 457; *Ely & Walker Dry Goods Co.* v. *McLaughlin, Dyer & Co.,* 78 Mo. App. 578, 585.

So, also, while the authorities are not wholly agreed as to whether a subsequent creditor, such as the present complainant, may maintain a suit to set aside the prior mortgage, the preponderance of authority is that when as in the case at bar the mortgage operates to defraud future creditors as well as creditors existing at its date subsequent creditors may maintain the suit. 14 Am. &

Eng. Ency. L. 267, 296; *Fahey* v. *Fahey,* 96 Pac. (Colo.) 251, 252; 2 Pomeroy, Eq. Jur., 4th ed., Sec. 973; *Gordon v. Reynolds,* 28 N. E. (Ill.) 455, 458.

The decree appealed from is affirmed.

*M. E. Winn* (*Thompson, Cathcart & Beebe* with him on the brief) for petitioner.

*S. B. Kemp* (*Huber & Kemp* on the briefs) for respondent-appellant.